UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                    Plaintiff,                                        REPORT & RECOMMENDATION

            v.                                                        04-CR-6180T

DONALD ANSON,

                    Defendant.

---

## BACKGROUND

By Order dated August 15, 2005, all pre-trial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 49).

Defendant Donald Anson ("Anson") is charged in a four-count superseding indictment.  (Docket # 31).  The first count charges that between December 16, 2003, and June 2, 2004, Anson, through the use of a computer, knowingly transported in interstate and foreign commerce over six hundred images of child pornography, in violation of 18 U.S.C. § 2252A(a)(1).  The second count charges that during the same period of time, Anson knowingly received through a computer over six hundred images of child pornography that had been transported in interstate and foreign commerce, in violation of 18 U.S.C. § 2252A(a)(2)(B).  Count Three charges that on June 2, 2004, Anson knowingly possessed material that contained over six hundred images of child pornography that had been transported in interstate and foreign commerce, in violation of 18 U.S.C. § 2252A(5)(B).  The final count charges that on July 2,

2004, Anson failed to appear before the court as required by his conditions of release, in

violation of 18 U.S.C. § 3146(a)(1).

　　　　　　Currently pending before this Court for a report and recommendation are Anson's

motions to suppress tangible evidence and statements.  Also before the Court is Anson's motion

to dismiss the Indictment.[1]  (Docket # 30).  Evidentiary hearings relating to Anson's suppression

motions were held on April 13, May 10, and May 26, 2005.  (Docket ## 39, 44, 46).  Special

Agents Timothy Kosinski and Brian Korzak of Immigration and Customs Enforcement testified

on behalf of the government.  Anson testified in his own defense.  The following constitutes the

findings of this Court.


# **FACTUAL BACKGROUND**

　　　　　　**Testimony Offered by Special Agents Kosinski and Korzak:**  Having heard

and reviewed the testimony offered by Special Agents Kosinski and Korzak, I find that it is

consistent in all relevant respects.  According to the agents, on June 2, 2004, law enforcement

agents executed a search warrant for Anson's residence at 121 Grassmere Park.  (Tr.A 6).[2]  At

approximately 7:40 a.m., Kosinski, Korzak and Special Agent Jeff Fuselier knocked on the door

---

[1]  Anson's omnibus motion also sought, *inter alia*, to strike surplusage from the Indictment, discovery and inspection, *Brady* material, witness statements, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence and the preservation of rough notes.  (Docket # 30).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on April 5, 2005.  (Docket ## 34, 35).

[2]  The transcript of the suppression hearing conducted before this Court on April 13, 2005, shall hereinafter be referenced as "Tr.A __."  (Docket # 39).

　　　The transcript of the suppression hearing conducted before this Court on May 10, 2005, shall hereinafter be referenced as "Tr.B __."  (Docket # 46).

　　　The transcript of the suppression hearing conducted before this Court on May 26, 2005, shall hereinafter be referenced as "Tr.C __."  (Docket # 44).

and announced, "Police, search warrant, open up."  Not receiving a response, Kosinski knocked

again, stating, "Police, search warrant, open the door."  (Tr.A 8).  As he looked through a

window, he saw someone coming and stated for a third time, "Police, open up the door, we have

a search warrant."  (Tr.A 8, 67).  The door was then opened by a man who identified himself as

Anson.  (Tr.A 8).

   As the agents entered the residence, Kosinski handed Anson a copy of the search

warrant and stated, "We're police, we have a search warrant for this residence."  (Tr.A 9, 69).

Kosinski also asked Anson whether there was somewhere they could talk.  Anson responded by

leading Kosinski and Korzak into the kitchen.  (Tr.A 9).  Kosinski then conducted a pat search of

Anson for weapons, as the other agents performed a security sweep of the residence to ensure

that no one else was present.  (Tr.A 10-11).  Anson and Kosinski sat at the kitchen table, and

Korzak sat on a stool behind Kosinski.  Anson was then asked to read the search warrant, which

he did.  (Tr.A 12).  Kosinski specifically testified that he did not intend to arrest Anson at this

time.  (Tr.A 9).

   After approximately ten minutes, the searching agents announced that the house

was "clear," and Kosinski initiated an interview of Anson.  (Tr.A 13).  Kosinski advised Anson

that he was free to leave at any time and asked him whether he wanted to do so.  (Tr.A 16, 43,

69).  Anson responded by indicating that he understood his right, but did not wish to leave.

(Tr.A 16, 43).  Indeed, Kosinski and Korzak both testified that Anson was reminded at least two

to four more times that he was free to leave.  (Tr.A 16, 69).  The interview lasted approximately

forty to forty-five minutes.  (Tr.A  17).  Anson was cooperative throughout the interview and

agreed to accompany the agents as they walked around his house and show them where certain

items were located.  (Tr.A 17-19, 73).  As they began to do so, however, Kosinski was informed

by the searching officers that the search had not yet been completed.  Kosinski and Korzak then

walked with Anson into the living room and waited for approximately fifteen minutes.  (Tr.A 19,

73).

Once the search was completed, Anson led the agents through the upstairs

bedrooms and identified compact disks (CDs) containing pornography.  (Tr.A 21).  They then

returned to the living room, and Korzak brought down some of the CDs identified by Anson,

which Anson signed.  (Tr.A 22).  Upon doing so, he inquired, "What's going to happen with me

now?"  (Tr.A 22).  Kosinski explained that there was an ongoing investigation and asked whether

Anson was willing to provide a written statement relating to the matters discussed during the

interview.  Anson agreed and was provided with a blank statement form.  (Tr.A 23, 73-74).

While he was writing the statement, Anson questioned the agents several times regarding what

should be included in the statement and was told to write down the information discussed during

the interview.  (Tr.A 23-24).  Once Anson finished the statement, he was instructed to review it

to ensure that it was correct.  Anson initially indicated that it was and gave the statement to the

agents.  (Tr.A 24, 75-76).  Anson then asked to have the statement back so that he could include

a reference to conduct occurring in the 1980s.  (Tr.A 76).  He was permitted to do so and, after

making the addition, Anson signed the statement.  (Tr.A 24, 76; G.Ex. 2).

Kosinski and Korzak continued to talk "casually" with Anson as the other agents

completed the search.  (Tr.A 26, 76).  During the conversation, Anson expressed concerns that

his brother "was going to come down and kill him" and that his family "was going to disown

him."  (Tr.A 76-77).

4

Shortly thereafter, Special Agent Marty Stanford informed Kosinski that three swords, a knife, a rifle and ammunition were discovered in the house. (Tr.A 26, 28). Mindful of his concerns about his family, the agents asked Anson whether he had any intention of hurting himself if the swords were left at the residence, but he would not provide a clear answer, stating only, "I don't know." (Tr.A 28, 29, 78). Kosinski then told Anson that he was taking the swords, and Anson replied, "Well, I can use – there's knives in the kitchen I can use, there's other things in the house I can use." (Tr. A 29, 78). Based upon his concern for Anson's safety if left alone, Kosinski explained that he attempted to contact the Assistant United States Attorney assigned to the case. Unable to contact him, Stanford contacted another attorney in the United States Attorney's Office. Acting upon that attorney's advice, Kosinski decided to take Anson into custody in order to ensure his personal safety. (Tr.A 30-31, 78-79).

Anson was then advised of his *Miranda* rights and asked to fill out a *Miranda* statement, which he signed. (Tr.A 32, 80; G.Ex. 3). Kosinski explained to Anson that he was being arrested for his own safety and was taken into custody. (Tr.A 32-33). Both Kosinski and Korzak testified that they had not intended to arrest Anson until they became concerned that he might attempt to harm himself if left alone after the warrant was executed. (Tr.A 9, 30, 79).

**Testimony Offered by Anson:** Anson testified that on June 2, 2004, at approximately 7:00 a.m., he heard pounding on both the front and back doors to his residence. (Tr.B 8; Tr.C 6; D.Ex. A). Anson went to the back door and turned the handle to the main door. According to Anson, federal agents had already opened the screen door and immediately started to enter, pushing him back against the wall. (Tr.B 9; Tr.C 7; D.Ex. B). According to Anson,

5

Kosinski was the third agent to enter.  As he walked in, he handed Anson a warrant, said he "would explain it in a minute" and asked whether there was someplace they could talk.  In response, Anson escorted Kosinski and Korzak into the kitchen, eventually sitting at the table. (Tr.B. 11, Tr.C 7; D.Ex. C).  Kosinski then explained that they had a search warrant relating to a child pornography charge.  (Tr.B 12).  Anson further testified that Kosinski told him that things would be easier if he cooperated and asked whether there were any weapons in the house.  (Tr.B 12, 16).  Anson indicated that there was a rifle in an upstairs bedroom.  (Tr.B 13).  Anson testified that during this conversation, he was "bracketed by a couple of officers" and did not feel free to leave.  (Tr.B 14).

    Anson further testified that, in an effort to cooperate, he offered to show the agents where certain CDs containing images of child pornography were located within the house. (Tr.B 17).  He explained that he believed his cooperation would be considered in determining the offense with which he would be charged.  (Tr.B 20).  Following the security sweep of the house, Kosinski, Korzak and Anson proceeded upstairs, and Kosinski directed Anson to the small computer room and instructed him to point without touching anything.  (Tr.B 19).  Anson then identified a few items, some of which were retrieved by the agents and brought downstairs. (Tr.B 20).  After identifying the evidence, Anson and the agents returned to the kitchen, where they continued to converse.  (Tr.B 20).  Anson indicated that there might be Digital Video Disks (DVDs) in his bedroom, but that he was unsure whether they contained child pornography or adult pornography.  (Tr.B 21).  The agents then escorted Anson upstairs again and entered the bedroom.  (Tr.B 22).  Anson identified certain DVDs that he believed might have child pornography on them and then returned with the agents to the kitchen.  (Tr.B 22).

6

Shortly thereafter, Anson and the agents moved into the living room so that other agents could conduct a more thorough search of the kitchen.  (Tr.B 22).  While in the living room, Anson testified that he was informed by an agent, "If you would make out a statement for us, you'll be free to go and you can go get your head on straight or talk to a lawyer or prepare for what's going to happen.  I'm not telling you you won't be arrested in the future, there is a good likelihood you would, but at least you'll have time to prepare."  (Tr.B 24).

According to Anson, at no time did any of the agents advise him of his *Miranda* warnings or indicate that he was free to leave without giving a statement.  (Tr.B 24).  Instead, Kosinski simply provided him with a statement form and a tray table.  Anson claims that Kosinski then dictated the statement to him and he transcribed it on the form as closely as he could.  (Tr.B 25-26; Tr.C 10; D.Ex. E).  Once he had finished, Anson turned the statement over to Kosinski.  Kosinski read the statement and then returned it to Anson, advising him, "Now if there is anything you want to say in your own defense, if you want to tell your side of the story, this is the time to do it."  Anson then added a final portion to the statement and signed it.  (Tr.B 26-27).

While they were still in the living room, one of the other agents informed Anson that he had discovered three ornamental swords and asked Anson whether he was going to hurt himself.  Anson tried to explain that he could not cut himself with the swords because they were not even as sharp as knives in the kitchen.  (Tr.B 29).  Anson further testified that he never indicated to the agents that he was worried that his brother was going to kill him or that he was going to kill himself.  (Tr.B 30; Tr.C 14).  Following this conversation, Kosinski and Korzak left the room to talk on their cellular telephones.  As they did so, the agent searching Anson's

computer announced that he had discovered pornography.  (Tr.B 30).  Shortly after that

discovery, Anson was arrested and directed to read and sign a *Miranda* warnings card.  (Tr.B 31).


## DISCUSSION

Anson moves to suppress evidence seized pursuant to the search of his residence

at 121 Grassmere Park, as well as to suppress statements made by him at the time of the search.

In addition, Anson moves for dismissal of the indictment pending against him on the grounds

that the government violated his rights under the Speedy Trial Act.  (Docket ## 30, 36, 47).


## I.  Suppression of Physical Evidence

Anson's motion to suppress physical evidence is based upon two independent

grounds.  First, Anson argues that suppression is necessary because the search warrant for his

residence was unsupported by probable cause.  Second, he contends that the law enforcement

officers who executed the search of his residence violated his constitutional rights because they

failed to satisfy the knock and announce requirement.

**A.  Probable Cause:**  Anson argues that all images of child pornography seized

from computers and electronic storage devices located in his residence at 121 Grassmere Park

should be suppressed.  According to Anson, the search warrant issued for his residence by United

States Magistrate Judge Jonathan W. Feldman was unsupported by probable cause, and thus all

evidence was seized in violation of his constitutional rights.

The Fourth Amendment to the Constitution provides that "no Warrants shall

issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see also*

Fed. R. Crim. P. 41. In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the

"totality of the circumstances" test to determine whether a search warrant satisfies the Fourth

Amendment's probable cause requirement. According to the Court, the issuing judicial officer

must "make a practical, common-sense decision whether, given all the circumstances set forth in

the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying

hearsay information, there is a fair probability that contraband or evidence of a crime will be

found in a particular place." *Id.* at 238. A reviewing court's obligation is merely to determine

that the issuing judge had a "'substantial basis for... conclud[ing]' that probable cause existed."

*United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238-39)

(internal quotation omitted). Moreover, "resolution of marginal cases should be determined by

the preference to be afforded to warrants." *Id.* (citing *Jones v. United States*, 362 U.S. 257, 270

(1960)).

This Court has reviewed the affidavit submitted by Special Agent Kosinski to

Judge Feldman in support of his application for the search warrant for 121 Grassmere Park.

(Docket # 30, Ex. C ("Kosinski Aff.")). In that affidavit, Kosinski affirmed that pursuant to an

Immigration and Customs Enforcement investigation (the "ICE Investigation"), agents

discovered that the website www.onlinesharingcommunity.com ("OSC") contained images of

child pornography that its members could download; the website also permitted members to post

images to it. (Kosinski Aff. at ¶¶ 14, 21, 22). Kosinski learned from agents involved in the ICE

Investigation that Anson had subscribed to the OSC website by using the e-mail address:

donjanson@juno.com.  Also, Anson had reportedly subscribed to OSC under the member name

"malto2" and had been assigned the member number 10672.  (Kosinski Aff. at ¶¶ 25, 30).

       Kosinski learned that the OSC website maintained a record of all user activity

based upon the assigned member numbers.  (Kosinski Aff. at ¶ 25).  When a member of OSC

uploaded an image to the site, his or her corresponding member number was added to the name

of the image file.  (Kosinski Aff. at ¶ 26).  The ICE Investigation provided Kosinski with a listing

of all images uploaded to the OSC website by member number 10672.  Based upon this

information and a review of the uploaded images, Kosinski concluded that between August 23,

2003 and September 17, 2003, Anson uploaded four images of child pornography to the OSC

website.  (Kosinski Aff. at ¶¶ 32-33).  A cross-reference of the IP address (65.229.131.104) of

the computer used by OSC member number 10672 with the member name "malto2" and e-mail

address donjanson.1@juno.com revealed that that IP address was assigned to Juno Online

Services.  A Juno Online Services records check confirmed that the e-mail address

donjanson.1@juno.com was assigned to Donald J. Anson at 89 Garland Avenue, Rochester, New

York.  (Kosinski Aff. at ¶¶ 34-35).

       On May 7, 2004, Kosinski was informed by a United States Postal Inspector that

Anson recently had registered a change of address with the United States Postal Service,

changing his address from 89 Garland Avenue to 121 Grassmere Park.  Kosinski thereafter

confirmed with Nothnagle Realty that Anson had sold his residence at 89 Garland Avenue in

March 2004.  (Kosinski Aff. at ¶ 36).  Consistent with that report, a Rochester Gas and Electric

utilities check revealed that Anson had changed his utilities service address from 89 Garland

Avenue to 121 Grassmere Park effective April 1, 2004.  (Kosinski Aff. at ¶ 37).  In addition, a

records check of Frontier Telephone of Rochester revealed that the telephone number provided by Anson to Juno Online Services (585-464-9148) was registered to Anson at 121 Grassmere Park.  Toll records for Anson's telephone further disclosed that between March 15, 2004 and May 25, 2004, Anson's telephone at 121 Grassmere Park was used to call the Juno Online Services telephone access number approximately two hundred times.  (Kosinski Aff. at ¶¶ 40-41).  Finally, Kosinski affirmed that during surveillance of 121 Grassmere Park on May 5, 2004 and May 26, 2004, two vehicles registered to Anson were observed parked at the residence. (Kosinski Aff. at ¶ 39).

Based upon his knowledge, experience and training, Kosinski also affirmed that undeleted files, and even deleted files or fragments of them, may remain on the computer "for an indefinite period."  (Kosinski Aff. at ¶ 9).  Moreover, according to Kosinski, if a deleted file has been overwritten, the computer may still maintain records of sites visited, when those visits occurred and whether any files were downloaded.  (Kosinski Aff. at ¶ 9).

On this record, I find that Judge Feldman was reasonable in finding that under the totality of the circumstances, probable cause existed to believe that evidence of child pornography possession and distribution would be found in Anson's residence at 121 Grassmere Park.  It is therefore my recommendation that Anson's motion to suppress for lack of probable cause be denied.  *See Illinois v. Gates*, 462 U.S. at 238.

Moreover, even if probable cause did not exist to justify the issuance of a search warrant, nothing in the record suggests that the searching officers did not rely on the warrant in good faith.  In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court held that the Fourth Amendment exclusionary rule should not be applied to evidence obtained by a police

officer whose reliance on a search warrant issued by a neutral magistrate was based on "objective

good faith," even though the warrant itself might ultimately be found to be defective.  *Id.* at

918-23; *United States v. Salameh*, 152 F.3d 88, 114 (2d Cir. 1998), *cert. denied*, 525 U.S. 1112

(1999); *United States v. Benedict*, 104 F. Supp. 2d 175, 182 (W.D.N.Y. 2000).  The rationale

underlying this good-faith exception is that the exclusionary rule "cannot be expected, and should

not be applied, to deter objectively reasonable law enforcement activity."  *Leon*, 468 U.S. at 919.

The Court in *Leon* identified four situations in which the good faith exception is

inapplicable.  Specifically, an executing officer's reliance on a search warrant will not be deemed

to have been in good faith:

> (1) where the issuing magistrate had been knowingly misled;
>
> (2) where the issuing magistrate wholly abandoned his or her judicial role;
>
> (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and
>
> (4) where the warrant is so facially deficient that reliance upon it unreasonable.

*Id.* at 923.  *See United States v. Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (citations omitted).

Here, Anson has not submitted any evidence to suggest that Judge Feldman was

misled by information in Kosinski's affidavit or that he wholly abandoned his role as a judicial

officer.  As stated above, Kosinski's affidavit set forth a detailed description of his investigation

of Anson's activities relating to child pornography.  Thus, it simply cannot be said that the search

warrant application was so lacking in probable cause as to render the executing officer's reliance

upon it unreasonable.  Finally, the search warrant was not so facially deficient that it would have

been unreasonable for the searching officers to rely upon it. Accordingly, even if the search warrant for 121 Grassmere Park was not supported by probable cause, Anson's motion to suppress the evidence seized from his residence should also be denied under the *Leon* good-faith exception.

**B. No-Knock Entry:** Anson also challenges the search of his residence on the grounds that the searching officers failed to knock and announce their presence before executing the warrant. (Docket # 30). The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As the Supreme Court has held, one factor to be weighed in considering the reasonableness of a search of a defendant's dwelling is the method of entry by the searching officers. *Wilson v. Arkansas*, 514 U.S. 927, 930 (1995) ("although a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interests may also establish the reasonableness of an unannounced entry"). *See* 18 U.S.C. § 3109 (searching officer may force entry if, after knocking and announcing his authority and purpose, he is denied admittance).

In his initial motion filed in this matter, Anson sought suppression of evidence seized from his residence, arguing that although the searching agents knocked on his door, they did not announce their presence, thus violating the Fourth Amendment. (Docket # 30 at ¶ 18, # 36 at ¶ 3). During the evidentiary hearings before this Court, Agents Kosinski and Korzak both testified that after approaching Anson's residence at 121 Grassmere Park, Kosinski knocked on the door and announced, "Police, search warrant, open up." Not receiving a response, Kosinski knocked for a second time, stating, "Police, search warrant, open the door." (Tr.A 8). Following

13

the second announcement, Kosinski saw Anson walking towards the door, at which time he

announced for a third time, "Police, open up the door, we have a search warrant." (Tr.A 8, 67).

Anson then opened the door, and as agents entered the residence, Kosinski handed him a copy of

the search warrant and stated, "We're police, we have a search warrant for this residence." (Tr.A

9, 69). *See Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 61 n.18 (2d Cir. 2003) (rejecting

defendant's challenge to a no-knock entry because law enforcement officers had in fact knocked

and announced their presence).

       The testimony offered by Anson was not inconsistent with that offered by the

agents. Anson testified that he heard pounding on both the front and rear doors of his residence.

He approached the rear door, turned the handle to the inner door and realized that the outside

storm door had already been opened. Once he started to open the inner door, Anson claims,

agents entered the house. Kosinski was the third agent to enter and, upon doing so he stated,

"Federal Agents, warrant." (Tr.B 8-9).

       Based upon the above testimony, I find that the searching agents knocked and

announced their presence at Anson's residence. This finding, however, does not completely

resolve Anson's motion. In his post-hearing submission, Anson argues, for the first time, that

because the agents opened the outside storm door and knocked on the inner door of his residence,

they violated the Fourth Amendment. (Docket # 47). Anson's argument is unavailing. As stated

above, the Fourth Amendment requires that searching officers knock and announce their

presence before *entering* a residence. It simply cannot be argued – nor does Anson offer any

authority in support of such contention – that the opening of an outer storm door for purposes of

knocking constitutes the entering of a residence.  Accordingly, I recommend denial of Anson's suppression motion on this basis as well.

## II.  <u>Suppression of Statements</u>

Anson moves to suppress all statements made by him while at his residence on the grounds that he was not advised of his Fifth Amendment right against self-incrimination. (Docket ## 30, 47).  The government opposes such motion, claiming that Anson made the challenged statements voluntarily and that he was not in custody at the time.  (Docket ## 33, 48).

In *Miranda*, the United States Supreme Court held that the government may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that privilege.  Here, the government apparently concedes that Anson was not advised of his *Miranda* warnings prior to the initiation of questioning by Kosinski and Korzak.  Rather, the government contends that administration of the *Miranda* warnings was not necessary because Anson was not in custody at the time he made the statements and thus was not subjected to custodial interrogation.

As the Second Circuit Court has articulated,

[c]ustodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminating nature of the disclosures sought (the investigative intent requirement).

15

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (internal citations omitted)).

In determining whether a defendant was in custody, a court must undertake a two-part analysis.  First, the court must ask "whether a reasonable person would have thought he was free to leave the police encounter at issue."  *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004), *cert. denied*, 125 S. Ct. 371 (2004).  If the answer is affirmative, the inquiry concludes. *Id.*  If, however, the reasonable person would not have felt free to leave, the Court must then proceed to the second step of the analysis and determine whether, in addition to feeling not free to leave, the "reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest."  *Id.* (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  "Only if the answer to this second question is yes was the person 'in custody for practical purposes' and 'entitled to the full panoply of protections prescribed by *Miranda*.'"  *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)); *see United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("[d]ecisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave").

In the instant matter, the credible testimony presented to this Court revealed that after entering the residence at 121 Grassmere Park, Kosinski and Korzak accompanied Anson to the kitchen table and presented him with a copy of the search warrant.  (Tr.A 12).  After learning that an initial security sweep of the residence had been completed, Kosinski initiated an interview of Anson.  Before asking him any questions, however, Kosinski and Korzak both testified that Anson was advised that he was free to leave at any time and asked whether he wanted to do so.

16

(Tr.A 16, 43, 69).  Anson responded by indicating that he understood his right, but did not wish

to leave.  (Tr.A 16, 43).  Thereafter, Anson and the agents had multiple conversations during

which Anson admitted that he possessed child pornography.  (Tr.A 23).  Anson also agreed to

walk around the house with the agents and to identify various CDs and DVDs that contained

child pornography.  (Tr.A 23).  Even after Anson made such admissions, however, Kosinski

testified that he did not intend to arrest him.  (Tr.A 23).  Indeed, the agents continued to remind

Anson on two to four additional occasions that he was free to leave.  (Tr.A 16, 69).

After Anson identified the CDs and DVDs containing child pornography, he

returned with the agents to the living room.  While there, Anson asked the agents, "What's going

to happen with me now?"  (Tr.A 22).  Kosinski explained that there was an ongoing investigation

and asked Anson whether he was willing to provide a written statement relating to the matters

discussed during the earlier conversations.  Anson agreed and was provided a statement form on

which to write.  (Tr.A 23, 73-74).  At the beginning of the statement, Anson wrote that he

understood that he was not under arrest and was free to leave.  (Tr.A 26).  As he continued to

write his statement, Anson asked several times what he should include in the statement and was

told to write down the information discussed during the interview.  (Tr.A 23-24).  When Anson

finished writing the statement, he was instructed to review it and was given the opportunity to

include additional information, which he did before signing the statement.

It was only after Anson completed the statement, and the agents became

concerned for Anson's safety, that he was taken into custody.  Specifically, Kosinski and Korzak

testified that after the written statement was completed, they continued to talk "casually" with

Anson as the other agents completed the search.  (Tr.A 26, 76).  During this conversation, Anson

began to express concerns that his family was going to disown him and that his brother was going to kill him.  (Tr.A 76-77).  Shortly thereafter, one of the searching agents informed Kosinski that they had discovered a rifle, ammunition, three swords and a knife.  (Tr.A 26, 28).  Mindful of Anson's earlier statements, the agents asked him whether he had any intention of hurting himself.  According to both Kosinski and Korzak, Anson responded evasively, stating only, "I don't know."  (Tr.A 29, 78).  Concerned for Anson's safety if left alone, the agents contacted an Assistant United States Attorney, who instructed them to arrest Anson.  Anson was then taken into custody and advised of his *Miranda* rights.  (Tr.A 30-32, 78-80).  Kosinski and Korzak each consistently testified that they had not intended to arrest Anson until they became concerned that he might attempt to harm himself.  (Tr.A 9, 30, 79).

On the record before me, I find that a reasonable person in Anson's position – that is, someone confronted with a search warrant for his residence who is repeatedly told by the searching officers that he is free to leave – would not have believed himself to be in custody. Rather, the reasonable person would have believed he was free to leave the police encounter.  *See United States v. Newton*, 369 F.3d at 672; *United States v. Benedict*, 104 F. Supp. 2d 175, 178-79 (W.D.N.Y. 2000) (statements made by defendant during execution of search warrant deemed admissible despite absence of *Miranda* warnings because defendant not in custody); *see also United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992) ("It is similarly clear that [defendant] was not in custody during his interview.  The entire interview occurred in the familiar surroundings of [his] home."); *United States v. Salvo*, 133 F.3d 943, 950-53 (6th Cir.) (defendant not in custody during questioning in his college dormitory concerning possession of child pornography), *cert. denied*, 523 U.S. 1122 (1998); *United States v. Dornhofer*, 859 F.2d 1195,

1200) (4th Cir. 1988) (questioning of defendant during search of his apartment for pornography did not constitute "custody"), *cert. denied*, 490 U.S. 1005 (1989).

Accordingly, I find that at the time Anson made the challenged statements, he was not subjected to custodial interrogation and thus a reading of the *Miranda* warnings was not required. It is therefore my recommendation that Anson's motion to suppress statements be denied.

## III.  Dismissal of the Indictment

In his final motion, Anson seeks dismissal of the Indictment pursuant to Title 18 U.S.C. § 3161. According to Anson, the government has violated his right to a speedy indictment. In pertinent part, the Speedy Trial Act provides, "Any [ ] indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested." 18 U.S.C. § 3161(b).

Anson was arrested based upon a criminal complaint on June 2, 2004, and appeared before this Court for an initial appearance later that same day. (Docket # 1). The original indictment in this matter was not filed against him until 188 days later, on December 7, 2004. (Docket # 16). Citing that 188-day lapse, Anson argues that dismissal of the indictment is required. Anson fails to recognize, however, that Section 3161(h) provides for periods of delay excludable from the thirty-day time limit and that the bulk of the 188-day period was properly excluded.

Following Anson's arrest on June 2, 2004, he appeared before this Court for an initial appearance, at which time he was released on conditions. (Docket # 2). At that hearing,

Anson waived his right to a preliminary hearing until July 2, 2004, and, at his request, the time

between June 2, 2004 and July 2, 2004 was excluded in the interests of justice by this Court.[3]

(Docket # 2).

Anson failed to appear as required for his next court appearance (Docket # 4) and

was arrested a month later in Florida on July 30, 2004.  (Docket # 6).  Because Anson willfully

failed to appear for the July 2, 2004 court appearance, and his whereabouts were unknown until

he was apprehended in Florida, the time between July 2, 2004 and August 2, 2004 (the date of his

initial appearance in connection with his Florida arrest) is excluded from the Speedy Trial Act

computations under 18 U.S.C. § 3161(h)(3)(A).  *See* 18 U.S.C. § 3161(h)(3)(A) ("[a]ny period of

delay resulting from the absence or unavailability of the defendant . . . shall be excluded in

computing the time within which . . . an indictment must be filed"); 18 U.S.C. § 3161(h)(3)(B)

("a defendant . . . shall be considered absent when his whereabouts were unknown and, in

addition, he is attempting to avoid apprehension or prosecution"); *United States v. Love*, 859 F.

Supp. 725, 736 (S.D.N.Y. 1994) (excluding 27-month period from Speedy Trial calculation

pursuant to 18 U.S.C. § 3161(h)(3)(A) because defendant had fled jurisdiction), *cert. denied*, 519

U.S. 951 (1996); *see also United States v. Blanco*, 861 F.2d 773, 778 (2d Cir. 1988) ("[a]

defendant's claim that the government violated her right to a speedy trial is seriously undermined

when the defendant, and not the government, is the cause of the delay"), *cert. denied*, 489 U.S.

1019 (1989); *United States v. Perez-Cestero*, 737 F. Supp. 752, 764 (S.D.N.Y. 1990)

---

[3] The time was excluded in the interests of justice under 18 U.S.C. § 3161(h)(8)(A) based upon this Court's finding that the defendant's and the public's right to a speedy indictment and a speedy trial was outweighed by the defendant's interest in having sufficient time to discuss the case with his attorney and determine whether to enter into plea negotiations with the government.  (Docket # 2).

(defendant's speedy trial claim is "seriously undercut" when delay is caused by defendant's flight).

At Anson's initial appearance in Florida on August 2, 2004, the government moved to detain him, and Anson waived his right to a detention hearing in Florida and agreed to a hearing within five days of the date of his appearance in the Western District of New York, which occurred on August 16, 2004.  The time between August 2, 2004 and August 16, 2004, was therefore excluded under 18 U.S.C. § 3161(h)(1)(F) because the government's motion for detention was pending during such time.[4]

Anson thereafter appeared before this Court on September 28, 2004,[5] October 28, 2004, and November 30, 2004.  (Docket ## 8, 12, 14, 15).  At each such appearance, in Anson's presence, his counsel requested that the period of time between each appearance (beginning with the appearance on August 16, 2004) be excluded from the Speedy Trial Act computations in the interests of justice pursuant to 18 U.S.C. § 3161(h)(8).[6]

On November 30, 2004, Anson requested a preliminary hearing, which was then scheduled for December 9, 2004, and no Speedy Trial Act exclusion was requested or granted.  (Docket # 15).  On December 7, 2004, the original indictment against Anson was filed.  (Docket

---

[4]  Ten days of the seventeen-day period were also excluded under 18 U.S.C. § 3161(h)(1)(H) as delay "resulting from transportation of [the] defendant from another district."

[5]  By letter dated September 13, 2004, counsel for the defendant requested that the status conference scheduled for September 17, 2004 be adjourned, noting that he was negotiating a possible disposition with the government, and requested an exclusion under the Speedy Trial Act.  This Court granted the request, adjourning the matter until September 28, 2004, and excluded the time under the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(8).  (Docket # 11).

[6]  This Court made specific findings at each appearance that the interests of justice would be served by the requested exclusion to permit the defendant sufficient time to continue plea negotiations with the government; at the October 28th status conference, time was also excluded to permit the defendant sufficient time to discuss the case with his then newly-appointed counsel.  (Docket ## 8, 12, 14, 15).

21

# 16).  Thus, the only time between Anson's arrest and the filing of the Indictment for which a Speedy Trial Act exclusion did not apply was the period between November 30, 2004 and December 7, 2004 (a total of seven days).  On this record, it is clear that the provisions of the Speedy Trial Act governing the return of an indictment have not been violated.

To the extent Anson claims that this Court's Speedy Trial Act exclusions were somehow inadequate, I disagree.  Anson has not articulated the basis upon which he believes the exclusions he requested or to which he agreed were improper.  *See United States v. Zedner*, 401 F.3d 36, 45 (2d Cir. 2005) (defendant requesting adjournment in ends of justice cannot later assert a Speedy Trial violation).  Accordingly, Anson's motion to dismiss the Indictment on the grounds that the government failed to comply with the Speedy Trial Act should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, it is my recommendation that defendant's motion to suppress tangible evidence seized from his residence **(Docket # 30)** be **DENIED.**  It is also the recommendation of this Court that defendant's motion to suppress statements made by him at the time of the search **(Docket # 30)** be **DENIED**.  Finally, it is my recommendation that defendant's motion for dismissal of the Indictment **(Docket # 30)** be **DENIED**.

 *s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
August  22 , 2005.

22

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[7]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **<u>Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.</u>**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

   *s/Marian W. Payson*          
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      August  22 , 2005.

---

[7] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).